**KLESTADT WINTERS JURELLER**
**SOUTHARD & STEVENS, LLP**
200 West 41st Street, 17th Floor
New York, New York 10036
Telephone: (212) 972-3000
Facsimile: (212) 972-2245
Kathleen M. Aiello

*Counsel to Yann Geron, Chapter 7 Trustee*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | |
| | : | Chapter 7 |
| EIGHT-115 ASSOCIATES, LLC, | : | |
| | : | Case No. 20-11812 (MG) |
| Debtor. | : | |

---------------------------------------------------------x

| | | |
|---|---|---|
| YANN GERON, as Chapter 7 Trustee of | : | |
| Eight-115 Associates, LLC, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| -against- | : | Adv. Pro. No. 22- |
| | : | _____(MG) |
| | : | |
| DANIEL REIFER, RMC EQUITIES, LLC and | : | |
| DRR IRREVOCABLE TRUST, | : | |
| | : | |
| Defendants. | : | |

---------------------------------------------------------x

**COMPLAINT OF PLAINTIFF/TRUSTEE AGAINST DANIEL REIFER AND**
**AFFILIATED ENTITIES, SEEKING ENTRY OF A JUDGMENT FOR**
**DAMAGES ARISING FROM (i) BREACH OF CONTRACT; (ii) UNJUST**
**ENRICHMENT; (iii) BREACHES OF THE FIDUCIARY DUTIES OF LOYALTY**
**AND CARE; (iv) CORPORATE WASTE; (v) CONVERSION; (vi) TURNOVER**
**OF PROPERTY OF THE ESTATE; (vii) AVOIDANCE OF CONSTRUCTIVE**
**AND INTENTIONAL FRAUDULENT CONVEYANCES, PURSUANT TO 11**
**U.S.C. §§ 544 AND 550, DCL §§ 272 – 279, AND (viii) DISALLOWANCE OF**
**CLAIMS PURSUANT TO 11 U.S.C. § 502**

Yann Geron (the "Trustee" or the "Plaintiff"), as the chapter 7 trustee of the estate of Eight-

115 Associates, LLC (the "Debtor"), the above-captioned debtor, by and through his undersigned

general counsel, Klestadt Winters Jureller Southard & Stevens, LLP, as and for his complaint (the "Complaint") herein against Daniel Reifer ("Reifer" or "Defendant Reifer"); RMC Equities, LLC ("RMC Equities" or "Defendant RMC Equities")) and the DRR Irrevocable Trust (the "DRR Trust" or "Defendant DRR Trust"), (each a "Defendant" and collectively, the "Defendants"), seeking a judgment against one or more of the Defendants to: (i) recover damages for breach of contract by Defendant Reifer, a limited partner of the Debtor's sole member; (ii) compel the disgorgement of any sums by which the Defendants have been unjustly enriched; (iii) recover damages for breaches of the fiduciary duties of loyalty and care by Defendants; (iv) recover damages for corporate waste by Defendant Reifer; (v) conversion; (vi) compel the turnover of estate property to the Trustee; recharacterization of distributions as partner loans; (vii) avoidance of constructive and intentional fraudulent conveyances, pursuant to 11 U.S.C. §§ 544 and 550 and New York Debtor and Creditor Law §§ 272-279; (viii) disallowance of claims pursuant to 11 U.S.C. § 502; and (x) related relief, including the payment of attorneys' fees and costs, alleges as follows:

## PRELIMINARY STATEMENT

Daniel Reifer and the DRR Trust, two of the named defendants in this Complaint, are purported limited partners of Lincoln 95 Associates, L.P. ("Lincoln 95"). Lincoln 95 was at all relevant times the sole member and manager of the Debtor. The Debtor's primary business purpose was the ownership of six rental properties in Harlem, New York.

The Claims in this Complaint focus largely upon what the Trustee asserts was gross mismanagement and wrongful conduct by the Defendants (and those in control of the Defendants and, at certain relevant times, the Debtor) over the rental properties and the damages sustained by the Debtor's estate as a result of that conduct. The Complaint also seeks to recover the significant

value siphoned out by Defendants from certain loan proceeds arranged for the ostensible benefit

of the Debtors while under the control of one or more of the Defendants.

## INTRODUCTION

1.       On August 6, 2020 (the "Petition Date"), the Debtor filed a voluntary petition for

relief under chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code") in the United

States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

2.       On or around August 7, 2020, Yann Geron was appointed interim chapter 7 trustee

of the Debtor's estate.

3.       On September 18, 2020, the Trustee presided over the first meeting of creditors in

the Debtor's case and became the permanent trustee herein by operation of section 702(d) of the

Bankruptcy Code.

## BASIS FOR RELIEF

4.       This adversary proceeding (the "Adversary Proceeding") is brought to recover

damages on account of: (i) breach of contract by Defendant Reifer, a purported limited partner of

the Debtor's sole member; (ii) the unjust enrichment of the Defendants at the expense of the

Debtor's estate and its creditors; (iii) breaches of the fiduciary duties of loyalty and care by the

Defendants; (iv) corporate waste occasioned by Defendant Reifer; (v) conversion of the Debtor's

assets by the Defendants; (vi) Defendants' failure to turnover of estate property to the Trustee (or

to otherwise compel the same); including, as necessary, the recharacterization of certain

distributions to one or more Defendants as loans to partners; (vii) avoidance of constructive and

intentional fraudulent conveyances, pursuant to 11 U.S.C. §§ 544 and 550 and New York Debtor

and Creditor Law ("NY-DCL") §§ 272-279; (viii) disallowance of claims pursuant to 11 U.S.C. §

502; and (x) related relief, including the payment of attorneys' fees and costs.

## JURISDICTION

5.      This Adversary Proceeding relates to the bankruptcy case of *In re Eight-115 Associates, LLC, Debtor,* Case No. 20-11812 (Bankr. S.D.N.Y. Aug. 6, 2020) (the "Bankruptcy Case"), which is pending under chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York before the Honorable Martin Glenn, Chief United States Bankruptcy Judge.

6.      The Bankruptcy Court has jurisdiction over this Adversary Proceeding by virtue of 28 U.S.C. §§ 157(a) and (b), and 1334(b), and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York (Ward, Acting C.J.), dated July 10, 1984.  The Bankruptcy Court has jurisdiction over the pendent state law claims pursuant to 28 U.S.C. § 1367.

7.      This is both a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (B), (C), (E), (F), (H), and (O), and a non-core proceeding under 28 U.S.C. § 157(b).  Plaintiff consents to entry of final orders or judgments by the Bankruptcy Court with respect to all non-core matters and claims raised by this Complaint.

8.      Venue is proper in this district pursuant to 28 U.S.C. § 1409(a) because this proceeding arises in a case under the Bankruptcy Code pending in this district.

## PARTIES

9.      Yann Geron is a member of the panel of private Chapter 7 trustees established by the United States Trustee pursuant to 28 U.S.C. § 586(a)(1).  The Trustee is the permanent Chapter 7 trustee of the Debtor and its bankruptcy estate and is empowered to bring this Adversary Proceeding.  The Trustee maintains an address for the conduct of business at 370 Lexington Avenue, Suite 1101, New York, New York 10017.

4

10.     As of the Petition Date, the Debtor was a limited liability company ("LLC") organized and existing under the laws of the State of Delaware.  The Debtor's form was previously converted from a limited partnership, then known as Eight-115 Associates, L.P.[1] (the "Predecessor Partnership"), by Certificate of Conversion filed with the Delaware Secretary of State on October 27, 2014.  The Debtor's registered office as of the Petition Date was c/o Anderson Kill P.C., 1251 Avenue of the Americas, 42nd Floor New York, New York 10020.  During its operation and prior to the Petition Date, the Debtor maintained its principal place of business c/o Reifer Management Company at 307 West 117th Street, New York, New York 10027.

11.     Prior to the Petition Date, the Debtor owned and operated six buildings located at: (i) 264 West 115th Street; (ii) 276 West 115th Street; (iii) 278 West 115th Street; (iv) 2120 Frederick Douglass Boulevard; (v) 2122 Frederick Douglass Boulevard; and (vi) 2124 Frederick Douglass Boulevard in New York, New York (collectively, the "Harlem Properties").   The Harlem Properties include both residential and commercial units.

12.     Lincoln 95 is a New York limited partnership, which was organized under the New York Uniform Limited Partnership Act pursuant to a Certificate of Limited Partnership dated as of June 1988.

13.     At all relevant times since the Debtor's conversion of form to an LLC, Lincoln 95 was the sole member and sole manager of the Debtor and authorized to acts on its behalf.

14.     At all relevant times, Stanley Reifer was the sole general partner of Lincoln 95.

15.     Defendant Reifer is the son of Stanley Reifer and a resident of State of New York

---

[1] The Debtor's predecessor entity, Eight-115 Associates, L.P., was a limited partnership formed under the laws of Delaware on or around June 18, 1990, with an address for service of process listed as c/o Rosen Livingston & Cholst LLP, 275 Madison Avenue., Ste. 500, New York, New York 10016.  Eight-115 Associates, L.P. surrendered its authority on October 29, 2014, when it was converted to a limited liability company.

who, upon information and belief, maintains an address of 2745 Broadway, Unit 115, New York, New York 10025 or, alternatively, 924 West End Avenue, # 115, New York, New York 10025. Defendant Reifer personally owns a 4.9535% interest in Lincoln 95 which is characterized as a limited partnership interest.

16.     Defendant DRR Trust is a New York Trust.  Upon information and belief and pursuant to a certain trust agreement dated December 28, 2012, Defendant Reifer is a co-Trustee and the sole beneficiary of the DRR Trust.  Defendant DRR Trust owns a purported limited partnership interest in Lincoln 95.[2]  Defendant DRR Trust maintains a principal place of business at 26 Court Street, Brooklyn, New York 11242.

17.     Defendant Reifer is also the owner, sole member and manager of RMC Equities LLC, which entity was formed as a limited liability company on December 14, 2009.  Defendant RMC Equities has a registered address for service of process care of Jared E. Paioff, Esq., Schwartz Sladkus Reich Greenberg Atlas LLP, 444 Madison Avenue, 6th Floor, New York 10022.

### FACTS COMMON TO ALL CAUSES OF ACTION

A. **The Debtor's Ownership and Management**

   i. **Eight-115 Associates, L.P. – The Debtor's Predecessor**

18.     As set forth above, the Predecessor Partnership was formed on June 18, 1990.

19.     Upon information and belief, Reifer Development Corp. ("Reifer Development"), a Subchapter S Corporation wholly owned by Stanley Reifer, previously owned a 1% general partnership interest in the Predecessor Partnership.

   ii. **Lincoln 95 – The Debtor's Sole and Managing Member**

20.     Lincoln 95 was originally formed by that certain Agreement of Limited Partnership,

---

[2] The remaining 4% limited partnership interest in Lincoln 95 is owned by Jeremy Reifer, Mr. Reifer's brother and Stanley Reifer's son.

dated on or around June 10, 1988, between and among Stanley Reifer, as general partner, and

Nancy Venturine and Gerald Martin, as limited partners.

21.     Upon information and belief, Lincoln 95 was not registered as a limited partnership

entity with the New York Department of State until approximately July 16, 2003.

22.     On or around December 4, 2008, Stanley Reifer assigned approximately 4% of his

limited partnership interest in Lincoln 95 to his son and Defendant Reifer's brother, Jeremy

Reifer.[3]

23.     On or around December 1, 2008, Gerald Martin, assigned his limited partnership

interest in Lincoln 95 to Stanley Reifer.

24.     On or around December 4, 2008, Stanley Reifer assigned 5% of his limited

partnership interest in Lincoln 95 to his son, Defendant Reifer.

25.     On or around December 4, 2008, Nancy Venturine, assigned her limited partnership

interest in Lincoln 95 to Stanley Reifer.

26.     By Assignment and Agreement, dated December 28, 2012, by and between Stanley

Reifer, as assignor, together with Defendant Reifer, Jeremy Reifer and Defendant DRR Trust,

Stanley Reifer assigned all his right, title and interest in and to his remaining 90% limited

partnership interest in Lincoln 95 to Defendant Reifer, Jeremy Reifer, as Trustees of the Defendant

DRR Trust, but retained his interest as the general partner of Lincoln 95.

27.     On or around May 14, 2014, Stanley Reifer executed that certain Assignment and

Exchange of General Partnership Interest of Eight-115 Associates L.P. for Lincoln 95 Associates,

---

[3] The Assignment of limited partnership interest(s) in Lincoln 95 to Jeremy Reifer and Daniel Reifer were executed by Stanley Reifer on January 1, 2006, but the notary signatures on the Assignment documents are dated December 4, 2008. Similarly, Nancy Venturine assigned her limited partnership interest in Lincoln 95 by execution of the assignment document on January 1, 2006, but the notary signature is dated December 4, 2008. The Assignment documents appears to be stamped by the State of New York on February 24, 2010. Therefore, it is difficult to determine when the assignments became effective.

L.P. (the "Exchange Agreement"), which was executed before Eight-115 Associates L.P. converted to the Debtor's current form as a limited liability company, wherein Lincoln 95 obtained a general partnership interest in the Predecessor Partnership and Reifer Development Corp. assigned its partnership interest in the Debtor to Lincoln 95.

28.     Thereafter, on October 29, 2014, the Debtor was converted from the Predecessor Partnership to the Debtor's current form as an LLC.

29.     Upon information and belief, by the end of 2014 and until the Petition Date, the ownership in the Lincoln 95 partnership was comprised of: (1) Stanley Reifer's 1.9207% general partnership interest; (2) Defendant DRR Trust's 89.163% limited partnership interest; (3) Defendant Reifer's 4.9535% limited partnership interest; and (4) Jeremy Reifer's 3.9628% limited partnership interest.

30.     Upon information and belief, Lincoln 95 never maintained a bank account during the Debtor's existence.

31.     However, Lincoln 95 owned, managed and operated all its assets, including its real property interests (i.e., the Harlem Properties), cash and receivables, through the Debtor, which Lincoln 95 completely controlled as its sole and managing member pursuant to an operating agreement.

**B.  The Debtor's Operating Agreement**

32.     Upon information and belief, the Debtor's management and operations are governed by that certain *Operating Agreement of Eight-115 Associates, LLC* (the "Operating Agreement"), dated on or around November 25, 2014.

33.     The Operating Agreement provides, in relevant part, the following provisions:

> ➢ **Purpose.** The Debtor was formed for the purpose of engaging in any lawful act or activity for which limited liability companies may be formed under the Delaware

Limited Liability Act, as amended from time to time ("LLCA"), or any successor
statute and engaging in any and all activities necessary or incidental to the
foregoing, including, but not limited to property management. The Debtor shall
have all of the powers provided for a limited liability company under the LLCA.
*See* Operating Agreement at ¶ 5.

➢ **Members.** Lincoln 95 is the Member of the Debtor and is **authorized to act on its
behalf**. At the time of the Operating Agreement, the mailing address for Lincoln
95 was c/o Daniel R. Reifer, RMC Equities, LLC, 26 Court Street, Suite 2304,
Brooklyn, New York, 11242. *See* Operating Agreement at ¶ 6 (*emphasis supplied*).

➢ **Powers.** The business and affairs of the Company shall be [*sic*] managed by the
Member. The Member shall have the power to do any and all acts necessary or
convenient to or for the furtherance of the purposes described herein, including all
powers statutory of otherwise, possessed by members under the LLCA. Any party
dealing with the Company shall be entitled to rely conclusively on the power and
authority of the Member. *See* Operating Agreement at ¶ 7.

➢ **Capital Contribution**. The Member has contributed One ($1.00) Dollar in cash
and its services to the Company. *See* Operating Agreement at ¶ 9.

➢ **Distributions. Distributions shall be made to the Member** at the times and in the
aggregate amounts determined by the Member. *See* Operating Agreement at ¶ 13
(*emphasis supplied*).

➢ **Governing Law**. The Operating Agreement is governed by, and construed in
accordance with, the laws of the State of New York applicable to agreements made
and to be performed entirely within such State, without reference to conflict of laws
principles. *See* Operating Agreement at ¶ 17.

**C.  Lincoln 95 Partnership Agreement**

34.    Upon information and belief, the management and operations of Lincoln 95, the

Debtor's sole member and manager, are governed by that certain *Lincoln 95 Associates Agreement

of Limited Partnership* (the "Partnership Agreement"), dated on or around June 10, 1988.

35.    The Partnership Agreement states that Lincoln 95 is organized as a limited

partnership under the New York Uniform Limited Partnership Act ("NY ULPA").

36.    The Partnership Agreement provides, *in relevant part*, for the following:

➢ **Purpose**. The specific business and purpose of the Partnership is investment in real
property and the provision of housing through acquisition, holding, construction,
development, operation, improvement, leasing or other dealings in the Property,

and in connection therewith, to make and perform contracts and other undertakings and to engage in any and all activities and transactions as may be necessary or advisable in connection therewith, including but not to limited to, the purpose, transfer, mortgage, pledge and exercise of all other rights, powers, privileges and other incidences of ownership with respect to the Property and to borrow or raise money without limitation as to amount of manner and to carry on any and all activities related to the foregoing. *See* Partnership Agreement at ¶ 2.4.

➢ Any Limited Partner shall "agree to make Capital Contributions in the aggregate amount set forth in Section 4.1…". *See* Partnership Agreement at ¶ 3.3(A).

➢ The original capital amount of each Partner is the amount of his Capital Contribution. No interest shall be paid on any Capital Contribution. *See* Partnership Agreement at ¶ 3.4(A).

➢ **No Limited Partner shall have the right to demand return of his Capital Contribution**, except as otherwise provided herein [. . .] No Limited Partner shall have the right to demand or receive property other than cash for his Interest. *See* Partnership Agreement at ¶ 3.4 (B) *(emphasis supplied)*.

➢ No Limited Partner shall be liable for any debts, liabilities, contracts or obligations of the Partnership, **unless he takes part in the management or control of the business of the Partnership**. *See* Partnership Agreement at ¶ 3.5 *(emphasis supplied)*.

➢ Funds not belonging to the Partnership shall not be commingled with the funds of the Partnership, **nor shall the Partnership funds be used except for business of the Partnership. Withdrawals from the Partnership bank accounts required the signature of the General Partner**. *See* Partnership Agreement at ¶ 8.1 *(emphasis supplied)*.

➢ The General Partner shall be authorized to retain and enter into an agreement with an affiliate of the General Partner ("Manager"), providing for Manager to manage the Property for the Partnership from and after the date the Partnership acquires the Property for a **management fee not to exceed 6% of the gross rental revenues** of the Project. *See* Partnership Agreement at ¶ 9.1 *(emphasis supplied)*.

➢ All profits, losses and tax credits incurred and/or accrued from and after the first day of the calendar month during which the Admission Date occurs, other than those arising from a Capital Transaction shall be allocated 99% to the Limited Partners and 1% to the General Partner. *See* Partnership Agreement at ¶ 10.1(A).

➢ All profits and losses arising from a Capital Transaction shall be shared by the Partners as follows as of the end of the calendar year in which the event [*sic*] in question shall occur:
  ▪ As to Profits:

1. To each Partner, an amount of profits equal to the amount of his Negative Basis.
2. To each Partner in an amount equal to said Partner's paid-in Capital Contribution.
3. The balance, if any, of such profits, 99% to the Limited Partners and 1% to the General Partner.
- As to Losses:
  1. To each Partner, an amount of losses equal to the amount of his Positive Basis.
  2. To each Partner in an amount equal to said Partner's paid-in Capital Contributions.
  3. The balance, if any, of such losses 99% to the Limited Partners and 1% to the general partner.

*See* Partnership Agreement at ¶ 10.1(B).

➢ **All profits and losses shared by the Partners shall be credited or charged, as the case may be, to their capital accounts**. All profits and losses allocable specifically to the Partners shall be **shared by them in accordance with their respective Sharing Ratios**. *See* Partnership Agreement at ¶ 10.1(C) *(emphasis supplied)*.

➢ Cash flow for each fiscal year or portion thereof shall be distributed at least annually, within ninety (90) days after the end of the fiscal year in question, as follows:
- 99% to the Limited Partners,
- 1% to the General Partner [*sic*].

**Cash Flow distributions to Limited Partners shall be noncumulative and shall only be made if available funds are generated from the operation of the Property after repayment of all loans due the General Partner and payment of any general partner fees due** for the year in which the Cash Flow is being distributed. *See* Partnership Agreement at ¶ 10.2(A) *(emphasis supplied)*.

The Partnership Agreement defines Cash Flow as the profits or losses of the Partnership subject to the following, *inter alia*, "(e) [t]he proceeds of any Mortgage refinancing and gain or loss from any sale, exchange, eminent domain taking, damage or destruction by fire or other casualty, or other disposition, of all or any part of the Property (other than the proceeds of any business or rental interruption insurance) shall not be included in determining Cash Flow.

➢ Prior to the dissolution, if the General Partner shall determine from time to time that cash is available for distribution from Capital Transactions including but not limited to the sale, refinancing or other disposition of the Property, such cash shall be applied or distributed as follows:
- First, to discharge (to the extent required by any lender or creditor) debts

and obligations of the Partnership;

- Second, to fund reserves which the General Partner may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Partnership;

- Third, to the Limited Partners in such priority and order so that the Limited Partner with the largest Capital Contribution will receive first distributions until said Capital Contribution is equal to the Capital Contribution of the then next largest Capital Contribution of a Limited Partner and thereafter said Limited Partners shall receive a distribution equally until their Capital Contributions are equal to the then next largest Capital Contribution of a Limited Partner, and similarly thereafter until all Limited Partners share equally and receive the amount of their Capital Contributions;

- Fourth, to the General Partner, the amount of their Capital Contributions; and

- Fifth, the balance thereof, if any, 99% to the Limited Partners to be shared equally and 1% to the General Partner.

*See* Partnership Agreement at ¶ 10.2(C).

➢ Cash Flow shall be distributed annually or more frequently, at the option of the General Partner in accordance with this [*sic*] Section 10.2.  For purposes of Subchapter K of the Code, the distributive shares for any fiscal year of the Partners in each item of the Partnership taxable income, gain, loss, deduction or credit shall be in the same proportions as their respective shares of items allocated under Section 10.1.A here. *See* Partnership Agreement at ¶ 10.2(E).

➢ The Partnership shall continue in full force and effect until December 31, 2038. *See* Partnership Agreement at ¶ 13.1.

➢ The Partnership Agreement is governed by and construed in accordance with the laws of the State of New York. *See* Partnership Agreement at ¶ 15.1.

**D.  Management of the Harlem Properties**

**i.  Management by Reifer Management Company as Controlled by Stanley Reifer**

37.    Upon information and belief, the managing agent (the "Manager") of the Harlem Properties is responsible for, *inter alia*, collecting rents on a monthly basis from tenants, maintaining the Harlem Properties and making or coordinating any repairs necessary to maintain the Harlem Properties in a habitable condition and otherwise keeping the Harlem Properties in a

condition to avoid or cure any violations, liens or other infractions asserted against the Debtor or the Harlem Properties by governmental agencies.

38.     Upon information and belief, until April 2013, Reifer Management Corp.[4], an entity owned and controlled by Stanley Reifer, served as the Manager for the Harlem Properties.

39.     Upon information and belief, no written agreement between the Debtor and Reifer Management Corp. existed to govern the terms of its role as the Manager of the Harlem Properties.

## ii.     Management by RMC Equities as Controlled by Defendant Daniel Reifer

40.     Upon information and belief, on or around April 2013, Defendant RMC Equities, an entity owned and controlled by Defendant Reifer, was appointed as the Manager for the Harlem Properties, effectively replacing Reifer Management Corp.

41.     During the period from April 2013 through October 2017, RMC Equities served as Manager of the Harlem Properties (the "RMC Equities Management Period").

42.     Upon information and belief, no written management agreement between the Debtor and Defendant RMC Equities existed to govern the terms of Defendant RMC Equities' role as the Manager of the Harlem Properties.

43.     At all times relevant to the RMC Equities Management Period, the Debtor maintained at least two bank accounts with Signature Bank, one ending in -2500 and the other ending in -4209 (together, the "Bank Accounts").

44.     All of the money in the Bank Accounts was property of the Debtor.

45.     Notwithstanding the lack of written management agreement and Section 9.1 of the Partnership Agreement which expressly limits the compensation of any such Manager to 6% of

---

[4] On July 1, 2021, Reifer Management Corp. filed a voluntary petition for chapter 7 relief in this Bankruptcy Court under Case No. 21-11225, Judge Michael E. Wiles presiding.  That case was fully administered and is now closed.

the monthly rent roll, Defendant Reifer caused the Debtor to compensate Defendant RMC Equities

for serving as Manager through monthly fees of approximately seven percent (7%) of the Debtor's

monthly rent roll.  These monthly fees to compensate the Manager were actually paid by the Debtor

directly to Defendant Reifer instead of to Defendant RMC Equities.

46.     During a portion of the RMC Equities Management Period between September

2015 and through May 2017, the Debtor also paid Defendant RMC Equities approximately $4,000

per month, which, upon information and belief was a reimbursement or partial payment or

insurance coverage.

47.     Upon information and belief, Defendant Reifer, by and through Defendant RMC

Equities, collected rents from the tenants of the Harlem Properties, paid certain business expenses

of the Debtor, and had signatory authority to the Debtor's Bank Accounts.

48.     Upon information and belief, Stanley Reifer did not have a managerial role with

respect to the Harlem Properties during the RMC Equities Management Period.

49.     During the RMC Equities Management Period, Defendant Reifer also caused the

Debtor to refinance its loans with Signature Bank.

50.     Upon information and belief, during the RMC Equities Management Period,

Defendant RMC Equities failed to, among other things: (i) properly maintain the rent rolls and

fund the security deposit account; (ii) pay the bills of key personnel and other creditors; (iii) cause

the Debtor to pay when due certain monthly debt service payments on account of the First Loan

and Second Loan (later defined) when they became due; and (v) otherwise failed to remove and

cure the violation identified in the Second Loan Violations Affidavit (later defined).

51.     On October 20, 2017, Stanley Reifer, as the General Partner of Lincoln 95, by and

through his counsel at McGuireWoods LLP, sent a letter to Defendant Reifer at RMC Equities

terminating Defendant RMC Equities, effective immediately, as the Manager for all properties owned by Lincoln 95 and/or the Debtor, including the Harlem Properties.

**E.**   **The Loans Against the Harlem Properties During the RMC Equities Management Period**

52.   On or about November 25, 2014, Signature Bank extended a loan (the "First Loan") to the Debtor in the principal amount of $5,775,000.00, pursuant to an Amended, Consolidated and Restated Mortgage Note, which was secured by a certain Mortgage Consolidation, Modification, Security Agreement and Fixture Filing, both dated November 25, 2014.   The mortgage for the First Loan was recorded in the office for the recording of mortgages in New York County on January 12, 2015 under CRFN 2015000013563.

53.   Defendant Reifer duly executed, acknowledged, and delivered to Signature Bank a certain Limited Guaranty (the "First Reifer Guaranty") with respect to the First Loan.

54.   On November 4, 2016, Signature Bank extended a second loan (the "Second Loan" and together with the First Loan, the "Loans") to the Debtor in the principal amount of $1,150,000.00, pursuant to a duly executed Mortgage Note, which was secured by a certain Second Mortgage, Security Agreement, Assignment of Leases and Rent and Fixture Filing, both dated November 4, 2016.   The mortgage for the Second Loan was duly recorded in the office for the recording of mortgages in New York County on November 14, 2016 under CRFN2016000398372.

55.   Defendant Reifer duly executed, acknowledged and delivered to Signature Bank a certain Limited Guaranty (the "Second Reifer Guaranty" and together with the First Reifer Guaranty, the "Reifer Guarantees") with respect to the Second Loan.

56.   To further secure payment of the Second Loan and pursuant to a certain Violations Affidavit dated November 4, 2016 (the "Second Loan Violations Affidavit"), the Debtor undertook the obligation to have certain violations relating to the Harlem Properties corrected within six (6)

15

months of the date of the Second Loan Violations Affidavit.

57.     By their terms, the First Loan and the Second Loan were each due to mature on December 10, 2019 (the "Maturity Date").

58.     On or around December 11, 2019, pursuant to, among other things (i) an Allonge; (ii) an Assignment of Mortgage Without Covenant; and (iii) an Omnibus Assignment of the loan and related documents, the First Loan was assigned by Signature Bank to Harlem Multifamily LLC (the "Lender"), which documents were subsequently recorded in the Registrar's Office (the "First Mortgage Assignment").

59.     On or around December 1, 2019, pursuant to, among other things (i) an Assignment of Mortgage without Covenant dated as of December 11, 2019; (ii) the Omnibus Assignment of Loan Documents, the Second Note, the Second Mortgage, the Second Loan Guaranty, the Second Loan Violations Affidavit and all other Second Loan Documents and all rights thereunder were assigned by Signature Bank to the Lender (the "Second Mortgage Assignment" and together with the First Mortgage Assignment, the "Mortgage Assignments").

60.     Upon information and belief, with the exception of some months, the Debtor made most of its monthly payments, albeit not all of which were timely paid, of principal and interest in accordance with the First Loan and Second Loan, but it failed to pay either loan balance in full on or before the Maturity Date (the "Maturity Event of Default").

61.     Upon information and belief, the Debtor failed to remove certain violations against the Harlem Properties that were required to be removed on or before May 4, 2017, as required by the Second Loan Violations Affidavit (the "Violations Event of Default").

62.     Upon information and belief, almost immediately following the Debtor's receipt of the First Loan and the Second Loan from Signature Bank, the Debtor fraudulently transferred a

16

substantial portion of the proceeds of the First Loan and Second Loan to Stanley Reifer, Defendant

Reifer, and their affiliated entities (the "Wrongful Transfers Event of Default" and together with

the Maturity Event of Default and the Violations Event of Default, the "Defaults").

63.     The First Loan and the Second Loan are cross-defaulted.

**F.   The Debtor's Transfers to the Defendants**

64.      Within the six years prior to the Petition Date, from August 6, 2014 to the Petition

Date (the "Recovery Period"), the Debtor made the transfers of money or value to each of the

Defendants, the majority of which were unauthorized, totaling no less than $1,694,967.99

(collectively, the "Transfers"), as set forth herein.

65.     Schedules of Transfers by year are annexed hereto as **Exhibit A**.

**1.   The 2014 Transfers**

66.     In 2014, the Debtor transferred to Defendant Reifer a total of $640,800

(collectively, the "2014 Transfers") from the proceeds of the First Loan from Signature Bank to

the Debtor.

**a.   Transfers to Defendant Reifer**

67.     Following the First Loan on November 25, 2014, while Defendant Reifer had

signatory authority over the Debtor's Bank Accounts, Defendant Reifer caused the Debtor to

transfer $600,000 (the "First Reifer Distribution") to Defendant Reifer on December 15, 2014.

68.     The source of the First Reifer Distribution was the loan proceeds remitted to the

Debtor.

69.     The First Reifer Distribution was characterized on the Debtor's books and records

as a "distribution."

70.     The Debtor did not make the First Reifer Distribution to its sole member, Lincoln

17

95, as required by Paragraph 13 the Debtor's Operating Agreement.

71.    At the time of the First Reifer Distribution, the Debtor did not have any profits from which to make a distribution to Lincoln 95 or its general or limited partners.

72.    At the time of the First Reifer Distribution, the Debtor did not have any capital to distribute to Lincoln 95, nor did Lincoln 95 have any capital to distribute to its partners.

73.    The First Reifer Distribution was not classified by the Debtor as a distribution of income.

74.    Instead, after receiving the First Reifer Distribution from the Debtor, Defendant Reifer's K-1 from Lincoln 95 shows that Defendant Reifer's capital account became more negative, which reflects an advance to Defendant Reifer rather than a distribution.

75.    Around the same time, on November 12, 2014, Defendant Reifer also caused the Debtor to transfer $3,400 to him personally, purportedly on account of the management fees due Defendant RMC Equities as Manager of the Harlem Properties for the period of January 2014.

76.    On December 2, 2014, Defendant Reifer caused the Debtor to transfer $37,400 to him personally and purportedly on account of management fees due Defendant RMC Equities as Manager of the Harlem Properties for the period of February through December 2014.

77.    In total, Defendant Reifer caused the Debtor to transfer $40,800 (the "2014 Management Fees") to him personally on account of management fees due RMC Equities as Manager for the Harlem Properties for 2014.

78.    Defendant Reifer caused the Debtor to pay the management fees to him personally rather than to Defendant RMC Equities which entity served as the Manager of the Harlem Properties at the time.

## 2. **The 2015 Transfers**

79.     In 2015, the Debtor transferred to Defendant Reifer and Defendant RMC Equities a total of $157,041.52 (collectively, the "2015 Transfers").

### a. **Transfers to Defendant Reifer**

80.     On January 6, 2015, and shortly after the First Reifer Distribution, Defendant Reifer caused the Debtor to transfer an additional $100,000 (the "Second Reifer Distribution") to him, which was recorded on the Debtor's books as a "distribution".

81.     The Debtor did not make the Second Reifer Distribution to its sole member Lincoln 95.

82.     At the time of the Second Reifer Distribution, the Debtor did not have any profits from which to make a distribution to Lincoln 95 or its general or limited partners.

83.     At the time of the Second Reifer Distribution, the Debtor did not have any capital to distribute to Lincoln 95, nor did Lincoln 95 have any capital to distribute to its partners.

84.     The Second Reifer Distribution was not classified by the Debtor as a distribution of income.

85.     Instead, after receiving the Second Reifer Distribution from the Debtor, Defendant Reifer's K-1 from Lincoln 95 shows that Defendant Reifer's capital account became even more negative, again reflecting an advance to Defendant Reifer rather than a distribution.

86.     Also in 2015, Defendant Reifer caused the Debtor to pay Defendant Reifer directly a total of $39,000 (the "2015 Management Fees") in purported management fees due RMC Equities as Manager for the Harlem Properties for January through October 2015. The 2015 Management Fees approximates $3,900 per month.

### b.  **Transfers to Defendant RMC Equities**

87.     On March 24, 2015, Defendant Reifer caused the Debtor to transfer $6,000 to Defendant RMC Equities.

88.     Thereafter, on September 23, 2015, October 22, 2015 and November 19, 2015, Defendant Reifer caused the Debtor to transfer $4,013.84 on each of those dates to Defendant RMC Equities.

89.     Upon information and belief, the $4,013.84 monthly payment from the Debtor to Defendant RMC Equities was a reimbursement of a monthly premium payment for insurance coverage of the Harlem Properties.

90.     In total, Defendant Reifer caused the Debtor to transfer $18,041.52 (the "2015 RMC Equities Transfers") to Defendant RMC Equities in 2015.

### 3.  **The 2016 Transfers**

91.     In 2016, the Debtor transferred to all the Defendants a total of $872,476.82 (collectively, the "2016 Transfers").

### a.  **Transfers to Defendant Reifer**

92.     In 2016, Defendant Reifer caused the Debtor to pay him personally a total of $66,336 (the "2016 Management Fees") in purported management fees for November 2015 and January through December 2016.

93.     The Debtor paid Defendant Reifer $7,800 in purported management fees for November 2015, which is nearly double the amount of the monthly management fee in other months when Defendant RMC Equities served as Manager of the Harlem Properties.

94.     During 2016, the Debtor paid Defendant Reifer approximately $4,878 per month in management fees on account of services provided to the Harlem Properties by Defendant RMC

Equities as the Manager.

**4.   Transfers to Defendant RMC Equities**

95.      In 2016, Defendant Reifer caused the Debtor to transfer a total of $56,140.82 to Defendant RMC Equities (the "2016 RMC Equities Transfers").

96.      During 2016, the Debtor transferred approximately $4,013.84 or $4,016.55 per month for approximately nine months to Defendant RMC Equities, presumably on account of payments towards the insurance premium.

97.      However, on November 9, 2016, following the Second Loan, the Debtor transferred $20,000 to Defendant RMC Equities, which appears inconsistent with the Debtor's monthly payments to Defendant RMC Equities.

**a.   Transfers to Defendant DRR Trust**

98.       Following the Second Loan on November 4, 2016, while Defendant Reifer still had signatory authority over the Debtor's Bank Accounts through RMC Equities' role as Manager of the Harlem Properties, Defendant Reifer caused the Debtor to make a series of transfers to Defendant DRR Trust, totaling $750,000 (collectively, the "DRR Trust Distributions"), which were taken from the loan proceeds remitted to the Debtor and characterized on the Debtor's books and records as "distributions."

99.      On November 4, 2016, Defendant Reifer caused the Debtor to transfer $175,000 to Defendant DRR Trust.

100.     On November 7, 2016, Defendant Reifer caused the Debtor to transfer $225,000 to Defendant DRR Trust.

101.     On December 1, 2016, Defendant Reifer caused the Debtor to transfer $50,000 to Defendant DRR Trust.

102.   On December 8, 2016, Defendant Reifer caused the Debtor to transfer $300,000 to Defendant DRR Trust.

103.   The Debtor did not make the DRR Trust Distributions to its sole member Lincoln 95.

104.   At the time of the DRR Trust Distributions, the Debtor did not have any profits from which to make a distribution to Lincoln 95 or its general or limited partners.

105.   At the time of the DRR Trust Distributions, the Debtor did not have any capital to distribute to Lincoln 95, nor did Lincoln 95 have any capital to distribute to its partners.

106.   The DRR Trust Distributions were not classified by the Debtor as distributions of income.

107.   Instead, after receiving the DRR Trust Distributions from the Debtor, Defendant DRR Trust's K-1 from Lincoln 95 shows that Defendant DRR Trust's capital account became even more negative, again reflecting an advance to Defendant DRR Trust rather than a distribution.

108.   The 2016 tax returns for Lincoln 95 show only $225,000 as a distribution to Defendant DRR Trust, rather than the $750,000 transferred as the DRR Trust Distributions.

109.   Although Defendant Reifer did not receive a "distribution" from the Debot in 2016, the 2016 tax returns for Lincoln 95 show a $584,000 distribution to Defendant Reifer.

**5.   The 2017 Transfers**

110.   In 2017, the Debtor transferred to all the Defendants a total of $24,649.65 (collectively, the "2017 Transfers").

**a.   Transfers to Defendant Reifer**

111.   During 2017, Defendant Reifer caused the Debtor to transfer to him personally a total of $12,600 (the "2017 Reifer Transfers").

b. **Transfers to Defendant RMC Equities**

112.    During 2017, Defendant Reifer caused the Debtor to transfer a total of $12,049.65 (the "2017 RMC Equities Transfers") to Defendant RMC Equities.

113.    Defendant RMC Equities maintained its role as the Manager of the Harlem Properties until October 2017 when its position was terminated by the Stanley Reifer as the general partner of Lincoln 95.

114.    Upon information and belief, upon the termination of RMC Equities as the Manager of the Harlem Properties, Defendant Reifer lost his access to and control over the Debtor's Bank Accounts.

115.    Following RMC Equities' termination as the Manager of the Harlem Properties and Defendant Reifer's loss of access to and control over the Debtor's Bank Accounts, none of the Defendants received any transfers from that point forward.

G. **Defendants Misconduct Caused the Debtor's Defaults Under First Loan and Second Loan**

116.    Following each of the Loans extended to the Debtor, Defendant Reifer, the maker of both Reifer Guarantees, directed significant portions of the loan proceeds from the Debtor's account to himself personally or to Defendant DRR Trust (of which Defendant Reifer was a beneficiary).

117.    Stanley Reifer, the general partner of Lincoln 95, received a significant transfer of the Debtor's loan proceeds from the First Loan; however, he did not receive any portion of the loan proceeds from the Second Loan.

118.    Upon information and belief, Defendant Reifer did not have authority from Lincoln 95's general partner, to direct any of the proceeds from the First Loan or the Second Loan to himself or to the DRR Trust, as required under the Partnership Agreement.

23

119.    The Debtor defaulted on both Loans because it failed to satisfy the Loans on or before the Maturity Date.

120.    The Debtor further defaulted on the Second Loan when it failed to correct or cause to be removed, certain violations from the Harlem Properties by May 4, 2017, as required by the Second Loan Violations Affidavit, which triggered a cross default under the Loans.

121.    Defendant RMC Equities, by and through Defendant Reifer, was the Manager of the Harlem Properties at the time of the Violations Event of Default.

122.    Defendant RMC Equities, by and through Defendant Reifer, was the Manager of the Harlem Properties before the time of the First Loan and for several months following the Violations Event of Default.

123.    Defendant Reifer, by and through Defendant RMC Equities as the Manager of the Harlem Properties, failed to cure the Violations on the Harlem Properties as the Debtor promised under the Second Loan Violations Affidavit.

124.    The Debtor defaulted on both Loans when Defendant Reifer caused the Debtor to issue the Transfers to the Defendants, the majority of which Defendant Reifer secreted, concealed, transferred or removed from the proceeds of the Loans that was, upon information and belief, intended to be used by the Debtor to, among other things, cure the violations on the Harlem Properties and otherwise to maintain and improve the properties.

125.    Rather than using the proceeds of the Loans for the aforementioned reasons and for the benefit of the Debtor, the Defendants received and were benefited by more than $1.4 million in unauthorized transfers to the detriment of the Debtor.

126.    Defendant Reifer removed the proceeds of the Loans and other property of the Debtor from the Debtor's Bank Accounts where rental income was also deposited, and transferred

24

them to himself and the other Defendants, which are his affiliates, without approval and in violation of the Loans, Operating Agreement and the Partnership Agreement.

127.    The acts and omissions of Defendant Reifer were instrumental in causing defaults under the Debtor's Loans even if Defendant RMC Equities was no longer acting as the Manager of the Harlem Properties at the time of the Maturity Event of Default.

128.    By the Maturity Date, the Debtor lacked sufficient liquid assets or cash to satisfy the Loans.

129.    The value of the Transfers made to the Defendants should have been available to the Debtor to cure the violations on the Harlem Properties or to otherwise pay down the Loans, but instead remained with the Defendants for their respective use and benefit.

### H. **Lincoln 95's Tax Returns**

130.    Upon information and belief, throughout the Recovery Period, Lincoln 95 treated the Debtor as a pass-through entity for tax purposes.

131.    Upon information and belief, the income, liabilities, profits, losses and other tax consequences implicating the Debtor were reported on the annual tax returns of Lincoln 95 as the Debtor's sole member.

132.    The partners of Lincoln 95 each received an annual K-1 from Lincoln 95 during tax years 2014 through 2019.

133.    Defendant Reifer was not a member of the Debtor.

134.    Defendant DRR Trust was not a member of the Debtor.

135.    Some of the Transfers made by the Debtor directly to Defendant Reifer, specifically the First Reifer Distribution and the Second Reifer Distribution, were reported as a "distribution", as reflected on Defendant Reifer's K-1s for 2014 and 2016.

136.    Some of the Transfers made by the Debtor directly to Defendant DRR Trust, specifically the DRR Distributions, were reported as "distributions" as reflected on Defendant DRR Trust's K-1 for 2016.

137.    The First Reifer Distribution, the Second Reifer Distribution and the DRR Distributions were improper at the time they were made because the Debtor did not have any profits during the Recovery Period that would have justified a "distribution" to Lincoln 95 or any of its partners.

138.    To the contrary, Defendant Reifer caused the First Reifer Distribution to be made following the First Loan when the Debtor had recently refinanced and incurred additional debt.

139.    Defendant Reifer also caused the Second Reifer Distribution and the DRR Trust Distributions to be made following the Second Loan when the Debtor had refinanced and incurred even more debt than existed in 2014 when the First Loan was made.

140.    Upon information and belief, Stanley Reifer[5], in his role as the general partner of Lincoln 95, did not authorize any of the Transfers to the Defendants during the Recovery Period, as required by the Partnership Agreement.

141.    There is no record of Jeremy Reifer, the third Limited Partner of Lincoln 95, receiving *pro rata* distributions at the same time as Defendant Reifer or Defendant DRR Trust received distributions as required by the Partnership Agreement, ¶ 10.1(C).

142.    Defendant Reifer maintained a negative capital account balance throughout the entire Recovery Period, as set forth below:

> ➤ 2014: ($720,436)
> ➤ 2015: ($719,205)
> ➤ 2016: ($1,426,675)

---

[5] Stanley Reifer, the general partner of Lincoln 95, received a "distribution" following the Debtor's receipt of the loan proceeds following the First Loan that the Debtor paid to him directly rather than by and through Lincoln 95.  That Transfer is not the subject of this Complaint.

➢ 2017: ($1,427,978)
➢ 2018: ($1,429,196)
➢ 2019: ($1,429,727)

143.    Defendant Reifer maintained a negative capital account balance before, during and after each of the Debtor's defaults under the Loans.

144.    The amounts of the First Reifer Distribution and the Second Reifer Distribution do not match the amount of the distributions reported in Defendant Reifer's capital account on his K-1s.

145.    Defendant Reifer's capital account balance remained negative as of the Petition Date.

146.    To date, Defendant Reifer has not restored or replenished his capital account to remedy the negative balance.

147.    Defendant DRR Trust maintained a negative capital account balance throughout the entire Recovery Period, as set forth below:

➢ 2014: ($2,232,619)
➢ 2015: ($2,210,469)
➢ 2016: ($2,419,627)
➢ 2017: ($2,443,075)
➢ 2018: ($2,465,002)
➢ 2019: ($2,474,558)

148.    Defendant DRR Trust maintained a negative capital account balance before, during and after each of the Debtor's defaults under the First Loan and Second Loan.

149.    The amounts of the DRR Distributions do not match the amount of the distributions reported in Defendant DRR Trust's capital account on its K-1s.

150.    Defendant DRR Trust's capital account balance remained negative as of the Petition Date.

151.    To date, Defendant DRR Trust has not restored or replenished its capital account

27

to remedy the negative balance.

**I.    Defendants' Proofs of Claim against the Debtor**

152.    By notice to creditors, dated August 5, 2021, this Court set November 8, 2021 (the "Bar Date"), as the deadline by which creditors were required to file a proof of claim against the Debtor's estate. *See* ECF No. 69.

153.    Defendant Reifer, by and through his respective corporate entities, filed seven different claims against the Debtor's estate (collectively, the "Daniel Reifer Claims").

154.    On November 6, 2020, RMC Holdings LLC filed Claim Number 2 as a general unsecured claim on the claims register for the Debtor's case in the amount of $85,000 (the "RMC Holdings Claim").

155.    The RMC Holdings Claim asserts that RMC Holdings made loans to the Debtor on the following dates and for the following amounts: (i) August 17, 2012 for $49,000; (ii) July 21, 2017 for $20,000; and (iii) October 19, 2017 for $16,000.

156.    On November 6, 2020, Defendant Reifer filed Claim Number 3 as a general unsecured claim on the claims register for the Debtor's case in the amount of $85,000 (the "Reifer Claim").

157.    The Reifer Claim asserts that Defendant Reifer made personal loans to the Debtor on the following dates and for the following amounts: (i) February 6, 2017 for $15,000; (ii) July 21, 2017 for $50,000; and (iii) July 21, 2017 for $20,000.

158.    On November 6, 2020, Defendant RMC Equities filed Claim Number 4 as a general unsecured claim on the claims register for the Debtor's case in the amount of $61,222.86 (the "RMC Equities Claim").

159.    The RMC Equities Claim asserts that the Debtor owes RMC Equities for: (i) unpaid

management fees, equal to 7% of the monthly rent role from February 2017 through October 2017; and (ii) loans on July 21, 2017 in the amount of $10,000 and on October 19, 2017 in the amount of $16,000.

160.    On November 6, 2020, Three Nickels LLC, an entity owned by Defendant Reifer, filed Claim Number 5 as a general unsecured claim on the claims register for the Debtor's case in the amount of $56,000 (the "Three Nickels Claim").

161.    The Three Nickels Claim asserts that Three Nickels made loans to the Debtor on the following dates and in the following amounts: (i) February 11, 2011 for $13,000; (ii) February 16, 2011 for $15,000; (iii) February 18, 2011 for $2,000; June 11, 2015 for $15,000; (iv) October 7, 2016 for $6,000; and (v) October 20, 2017 for $5,000.

162.    On November 6, 2020, 1717 Rochester, LLC, an entity owned by Defendant Reifer, filed Claim Number 6 as a general unsecured claim on the claims register for the Debtor's case in the amount of $44,360.30 (the "1717 Rochester Claim").

163.    The 1717 Rochester Claim asserts that 1717 Rochester made a loan to the Debtor on May 23, 2012 for $44,360.30.

164.    On November 6, 2020, Eastern-D, LLC, an entity owned by Defendant Reifer, filed Claim Number 7 as a general unsecured claim on the claims register for the Debtor's case in the amount of $31,100 (the "Eastern-D Claim").

165.    The Eastern-D Claim asserts that Eastern-D made loans to the Debtor on the following dates and in the following amounts: (i) April 18, 2012 for $27,000; and (ii) March 17, 2017 for $4,100.

166.    On November 6, 2020, 2 Macon Street Associates, L.P., an entity owned by Defendant Reifer, filed Claim Number 8 as a general unsecured claim on the claims register for

the Debtor's case in the amount of $10,000 (the "2 Macon Street Claim").

167.    The 2 Macon Street Claim asserts that 2 Macon Street made a loan to the Debtor on July 21, 2017 for $10,000.

**J.    The Debtor's Liabilities on the Petition Date**

168.    As a result of the Debtor's defaults on the Loans and as of the Petition Date, the Lender asserted that the Debtor owed the Lender approximately $14 million on the First Loan and the Second Loan.

169.    On January 20, 2021, the Court "So-Ordered" that certain *Stipulation and Order, Pursuant to Bankruptcy Rule 9019 and Sections 105, 32, 363, 364, and 502 of the Bankruptcy Code, (I) Settling and Allowing the Claims of Harlem Multifamily LLC; (II) Determining Harlem Multifamily LLC has First Priority Liens on the Debtor's Property; (III) Directing the Sale of the Debtor's Real Property; and (IV) Granting Related Relief* (the "Lender Stipulation") [ECF No. 49], which, *in relevant part*, reduced the Lender's Claim from $14 million and fixed the amount at $11 million (the "Lender Claim").

170.    The Lender's Claim has existed since at least November 25, 2014.

171.    Prior to the Petition Date, in a foreclosure proceeding against the Debtor, among other defendants, the Lender asserted that the Debtor defaulted on the First Loan as early as January 6, 2015, when the Wrongful Transfers Event of Default occurred.

172.    Through the First Reifer Distribution, Defendant Reifer removed proceeds of the First Loan from the Debtor's control as early as December 15, 2014.

173.    On October 13, 2021, the Trustee closed on the sale of the Harlem Properties to a third-party purchaser and pursuant to an order of the Bankruptcy Court (the "Harlem Properties Sale").

174.    As a result of the Harlem Properties Sale, the Trustee was able to make a distribution to the Lender of approximately $9.2 million on account of the Lender Claim.

175.    Notwithstanding the distribution on account of the Lender Claim from the sale of its collateral under the Loans, the Lender remains a creditor of the Debtor's estate by virtue of the remaining deficiency claim which is unsecured.

176.    The Lender, by assignment, has been a creditor of the Debtor since November 25, 2014.

177.    As a result of the defaults and the Debtor's inability to satisfy the First Loan and the Second Loan, the Lender Claim is comprised of both a secured and an unsecured component.

178.    Because of the numerous defaults on the Loans, caused in large part by the actions of the Defendants stated herein, the Debtor has been, and continues to be, unable to pay its debts as they became due, including to the Lender.

### FIRST CAUSE OF ACTION
**Breach of Contract**
**(Against Defendants Reifer and the DRR Trust)**

179.    Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 178 of this Complaint as if fully set forth at length herein.

180.    The Operating Agreement and policies and practices promulgated thereunder constitute a valid and enforceable contract between the Debtor and Lincoln 95.

181.    At all relevant times, Lincoln 95 has owned, managed, and operated all of its assets, including its interest in the Debtor and its real property holdings (i.e., the Harlem Properties), cash, and receivables, through the Debtor, which Lincoln 95 completely controls as its sole and managing member pursuant to the Operating Agreement.

182.    At all relevant times and in its capacity as sole member of the Debtor, Lincoln 95

managed the Debtor's business and affairs.

183.    The Partnership Agreement and policies and practices promulgated thereunder constitute a valid and enforceable contract between and among the partners of Lincoln 95.

184.    Upon information and belief, Lincoln 95 did not maintain its own bank accounts.

185.    The Debtor permitted access to its Bank Accounts to the then-appointed Manager of the Harlem Properties.

186.    During the RMC Equities Management Period, Defendant RMC Equities served as the Manager of the Harlem Properties.

187.    Lincoln 95 maintained a capital account for each of its partners.

188.    The Debtor did not file its own tax returns.  Instead, Lincoln 95 treated the Debtor as a pass-through entity for tax purposes.

189.    The Debtor's tax consequences were reported annually through Lincoln 95's tax return.

190.    Lincoln 95 issued K-1 statements to each of its partners, including Defendant Reifer and Defendant DRR Trust.

191.    Defendant Reifer had access to the Debtor's Bank Accounts during the RMC Equities Management Period.

192.    The First Reifer Distribution, Second Reifer Distribution and the DRR Trust Distributions were all paid from the Debtor's Bank Accounts.

193.    The First Reifer Distribution, Second Reifer Distribution and the DRR Trust Distributions were all made during the RMC Equities Management Period.

194.    Upon information and belief, Defendant Reifer did not have the authority of Lincoln 95's general partner, Stanley Reifer, to make the First Reifer Distribution, Second Reifer

Distribution and the DRR Distributions as required by the Partnership Agreement.

195.    The First Reifer Distribution and the Second Reifer Distribution were paid by the Debtor directly to Defendant Reifer.

196.    The DRR Trust Distributions were paid by the Debtor directly to Defendant DRR Trust.

197.    The First Reifer Distribution, Second Reifer Distribution and the DRR Trust Distributions were not made to Lincoln 95, as the Debtor's member, as required by Paragraph 13 the Debtor's Operating Agreement.

198.    Defendant Reifer did not wait until the year-end to cause the Debtor to make the First Reifer Distribution, Second Reifer Distribution and the DRR Trust Distributions as required by Paragraph 10.1(C) of the Partnership Agreement.

199.    Defendant Reifer caused the Debtor to make the Second Reifer Distribution and the DRR Trust Distributions only to entities with which he was affiliated, and failed to make a distribution, or payment of any kind to the other limited partners of Lincoln 95 as required by Paragraph 10.1(C) of the Partnership Agreement.

200.    None of the other limited partners of Lincoln 95 received a distribution of any kind.

201.    On or before December 31, 2014, Defendant Reifer's capital account became negative and his capital account remained negative until the Petition Date.

202.    On or before December 31, 2014, Defendant DRR Trust's capital account became negative and its capital account remained negative until the Petition Date.

203.    Defendants Reifer and the DRR Trust have breached the Operating Agreement by failing to make capital contributions sufficient to meet the mandated capital account balance maintained at Lincoln 95, to or for the benefit of the Debtor.

204.    The aggregate Transfers, specifically the First Reifer Distribution, Second Distribution, and the DRR Trust Distributions, received by Defendant Reifer and Defendant DRR Trust, respectively, was in direct violation of one or more of the above-referenced provisions of the Debtor's Operating Agreement or the Lincoln 95 Partnership Agreement.

205.    Defendant Reifer and Defendant DRR Trust breached those agreements by failing to repay those amounts to the Debtor, particularly when the Debtor was unable to satisfy the Loans or otherwise to cure the violations on the Harlem Properties, among other debts.

206.    Therefore, the Trustee seeks judgment in his favor and against Defendants Reifer and the DRR Trust in an amount to be determined at trial that is no less than an amount sufficient to return the amount of the First Reifer Distribution, Second Distribution, and the DRR Trust Distributions, together with costs, interest, attorneys' fees and any other relief deemed just and appropriate.

### SECOND CAUSE OF ACTION
**Unjust Enrichment**
**(Against All Defendants)**

207.    Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 206 of this Complaint as if fully set forth at length herein.

208.    Each of the Transfers constituted a transfer of interest of the Debtor in property within the meaning of section 101(54) of the Bankruptcy Code.

209.    Each of the Transfers was to or for the benefit of the each of the Defendants named herein.

210.    The Defendants were enriched as a result of the Transfers.

211.    The enrichment of the Defendants was at the expense of the Debtor, its estate and its creditors.

212.    The Defendants wrongfully secured a benefit from the Debtor by refusing to repay to the Debtor the amounts of First Reifer Distribution, Second Distribution, and the DRR Trust Distributions, which should have been properly characterized as loans based on the lack of Debtor profits during the period in question.

213.    At the time of the Transfers to each of the Defendants, the Debtor was not and could not pay its debts as they became due. The Debtor was taking on new debt at the time that it was making sizeable Transfers to Defendant Reifer and Defendant DRR Trust. The Transfers benefitted Defendant Reifer and Defendant DRR Trust at the expense of the Debtor, which was failing to cure violations on the Harlem Properties and otherwise defaulting on its loan obligations. Nevertheless, while Defendant Reifer had access to the Debtor's Bank Accounts in his role as Manager of the Harlem Properties through Defendant RMC Equities, he diverted significant monies from the Debtor directly to the Defendants while the Debtor was not able to satisfy its obligations.

214.    The Defendants' failure to replenish the Debtor's estate the amounts of the First Reifer Distribution, Second Distribution, and the DRR Trust Distributions, is contrary to principles of fairness and good conscience.

215.    The Defendants would be unjustly enriched unless the Trustee is allowed to recover these funds on behalf of the Debtor's estate.

216.    Based upon the foregoing, in the alternative to a finding in favor of Plaintiff for the breach of contract claims in the First Cause of Action, the Trustee is entitled to an order and judgment against the Defendants for damages caused to the Debtor in the amount for which the Defendants were enriched, which is collectively in an amount no less than $1.45 million and directing the Defendants to return the Transfers or the value thereof, to the Trustee, together with

35

prejudgment interest and attorneys' fees.

### THIRD CAUSE OF ACTION
**Breaches of Fiduciary Duties of Care and Loyalty**
**(Against Defendant Reifer and Defendant RMC Equities)**

217.    Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 216 of this Complaint.

218.    During the RMC Equities Management Period, Defendant RMC Equities was the Manager of the Harlem Properties.

219.    As the Manager of the Harlem Properties, Defendant RMC Equities, and Defendant Reifer as its sole manager and member, owed the Debtor, whose sole assets were the Harlem Properties and the rental income derived therefrom, a fiduciary duty.

220.    Defendant Reifer, as a limited partner of Lincoln 95, owed a fiduciary duty to the general and other limited partners of Lincoln 95.

221.    Defendant Reifer, as a limited partner, became liable as a general partner under New York Partnership Law § 96, when he assumed control over and exercised management rights and authority over the business during the RMC Equities Management Period.

222.    As Lincoln 95's only assets were the Harlem Properties, the general and limited partners of Lincoln 95 owed a fiduciary duty to the Debtor to maintain the value of the Harlem Properties.  At a minimum, the maintenance of the Harlem Properties required maintenance and upkeep, avoidance and cure of violations, penalties, fines and other issues impacting the value of the Harlem Properties and complying with the obligations underlying the Loans to avoid the Debtor's default of those Loans, risking additional, and avoidable, liabilities for the Debtor.

223.    Defendant Reifer and Defendant RMC Equities each had a duty to deal honestly and fairly with the Debtor, both as the Manager of the Harlem Properties and as a limited partner

of Lincoln 95.

224.   Defendant RMC Equities, by and through Defendant Reifer, had a duty to manage the Harlem Properties fairly, justly and in an equitable manner.

225.   Defendant RMC Equities and Defendant Reifer each had a duty to act in furtherance of the best interests of the Debtor, independently and as an extension of Defendant Reifer's fiduciary duties as a limited partner of Lincoln 95, not in furtherance of his personal interests or the corporate interests of non-Debtor, Defendant RMC Equities.

226.    Defendant RMC Equities, by and through Defendant Reifer, had a duty to operate the Harlem Properties in a manner that benefits the Debtor.

227.   Defendant RMC Equities, by and through Defendant Reifer, had a duty to refrain from abusing a position of trust that is attendant upon it as Manager of the Harlem Properties and to not engage in self-dealing.

228.   Defendant RMC Equities, by and through Defendant Reifer, owed duties of care, loyalty, honesty, good faith, and fair dealing.

229.   Defendant RMC Equities, by and through Defendant Reifer, breached these duties when, by virtue of Defendants RMC Equities' access to the Debtor's Bank Accounts through its role as Manager of the Harlem Properties, caused the Debtor to make the Transfers to the Defendants during the RMC Equities Management Period.

230.   Neither Defendant Reifer nor Defendant RMC Equities had authority to make the Transfers from the Debtor's account to Defendants Reifer and the DRR Trust.

231.   Neither Defendant Reifer nor Defendant RMC Equities had the consent of Lincoln 95 or its general partner to make the Transfers from the Debtor to the Defendants.

232.   Neither Defendant Reifer nor Defendant DRR Trust used the Transfers to benefit

the Debtor or the Harlem Properties.

233.    The Harlem Properties fell into disrepair and incurred violations from the City of New York during the time when Defendant RMC Equities was the Manager of the Harlem Properties.

234.    The Debtor's consent to the Second Loan Violations Affidavit and the Debtor's Violations Event of Default both occurred during the RMC Equities Management Period when Defendant Reifer had access to the Debtor's Bank Accounts and resources and the obligation to cure the violations.

235.    Defendant Reifer, by and through Defendant RMC Equities, failed to cure the violations on the Harlem Properties by May 4, 2017, as required by the Second Loan Violations Affidavit.

236.    The conduct of Defendant RMC Equities, by and through Defendant Reifer, deprived the Debtor, its creditors, including the Lender, the Harlem Properties and the Debtor's owner, Lincoln 95 and the other partners of Lincoln 95 of money to which they are entitled.

237.    As a result of the Debtor not having access to the monies transferred by the Debtor, by and through Defendant RMC Equities and Defendant Reifer, to the Defendants, the Debtor incurred violations and otherwise defaults on the Loans.

238.    The Loans incurred by the Debtor in 2014 and 2016 increased the Debtor's liabilities and debt burden and violations and defaults under those Loans resulted in higher payments owed by the Debtor to the Lender, contributing to the Debtor's losses in years following the RMC Equities Management Period.

239.    The Defendants' interference with the conduct and control of the Debtor's business and the business of Lincoln 95 is a violation of the NY ULPA.

240.    The Debtor fully performed its obligations under the Operating Agreement.

241.    Lincoln 95 fully performed its obligation under the Partnership Agreement.

242.    Based upon the foregoing, the Trustee is entitled to an order and judgment against the Defendants for damages caused to the Debtor in an amount to be determined at trial, but no less than $1,694,967.99, and directing the Defendants to return the Transfers or the value thereof, to the Trustee, together with prejudgment interest and attorneys' fees.

### FOURTH CAUSE OF ACTION
**Corporate Waste**
**(Against Defendant Reifer)**

243.    Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 242 of this Complaint.

244.    By virtue of Defendant Reifer's access, by and through Defendant RMC Equities as Manager of the Harlem Properties, to the Debtor's Bank Accounts and other assets, Defendant Reifer owed a duty to the Debtor, as well as to Lincoln 95, not to waste the Debtor's corporate assets.

245.    Following each of the Loans, Defendant Reifer deliberately and without regard for the Debtor's financial position or need to cure the violations on the Harlem Properties or to eventually satisfy the Loans, caused the Debtor to make the First Reifer Distribution, the Second Reifer Distribution and the DRR Trust Distributions.

246.    The First Reifer Distribution, the Second Reifer Distribution and the DRR Trust Distributions solely benefitted Defendant Reifer, both personally and through the DRR Trust.

247.    The Debtor did not benefit from the majority of the loan proceeds it received from the Loans, but it was liable for the obligations it incurred as a result of taking on the Loans.

248.    Defendant Reifer wasted the Debtor's corporate assets in a manner that did not

benefit the Debtor, the Harlem Properties or the Debtor's creditors.

249.    Defendant Reifer wasted the Debtor's corporate assets when he bypassed the Debtor's sole member, Lincoln 95, as well as its general partner and limited partners in making payments directly to himself or to Defendant DRR Trust.

250.    As a result of Defendant Reifer's waste of corporate assets, the Debtor defaulted on the Loans to the Lender.

251.    As a result of Defendant Reifer's waste of corporate assets, the Debtor was compelled to filed this Bankruptcy Case and to liquidate the Harlem Properties.

252.    Notwithstanding the Harlem Properties Sale, the Debtor continues to have unfulfilled obligations.

253.    Based upon the foregoing, the Trustee is entitled to an order and judgment against Defendant Reifer for damages caused to the Debtor in an amount to be determined at trial, but no less than $1,694,967.99, and directing the Defendants to return the Transfers or the value thereof, to the Trustee, together with prejudgment interest and attorneys' fees.

## FIFTH CAUSE OF ACTION
### Conversion
### (Against all Defendants)

254.    Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 253 of this Complaint.

255.    At all times, the Debtor was the rightful owner of the Bank Accounts from which the Transfers were made.

256.    At all times, Lincoln 95 was the derivative owner of the Bank Accounts from which the Transfers were made.

257.    The Defendants converted the money in the Debtor's Bank Accounts for their own

respective use or benefit without the authorization, knowledge or consent of the Debtor, Lincoln 95, or the other partners of Lincoln 95.

258.   As of November 25, 2014, the Debtor was the rightful owner of the proceeds of the First Loan as deposited in its Bank Account.

259.   On or about December 15, 2014, Defendant Reifer converted $600,000 of the proceeds of the First Loan to the Debtor, which was deposited in the Debtor's Bank Account, to himself, for his own use or benefit, without the authorization, knowledge, or consent of the Debtor, Lincoln 95, or the other partners of Lincoln 95.

260.   On or about January 6, 2015, Defendant Reifer converted $100,000 of the proceeds of the First Loan to the Debtor, which was deposited in the Debtor's Bank Account, to himself, for his own use or benefit, without the authorization, knowledge, or consent of the Debtor, Lincoln 95, or the other partners of Lincoln 95.

261.   On or about November 4, 2016, Defendant Reifer converted $175,000 of the proceeds of the Second Loan to the Debtor, which was deposited in the Debtor's Bank Account, to his trust, Defendant DRR Trust, for his or its own use or benefit, without the authorization, knowledge, or consent of the Debtor, Lincoln 95, or the other partners of Lincoln 95.

262.   On or about November 7, 2016, Defendant Reifer converted $225,000 of the proceeds of the Second Loan to the Debtor, which was deposited in the Debtor's Bank Account, to his trust, Defendant DRR Trust, for his or its own use or benefit, without the authorization, knowledge, or consent of the Debtor, Lincoln 95, or the other partners of Lincoln 95.

263.   On or about December 1, 2016, Defendant Reifer converted $50,000 of the proceeds of the Second Loan to the Debtor, which was deposited in the Debtor's Bank Account, to his trust, Defendant DRR Trust, for his or its own use or benefit, without the authorization,

knowledge, or consent of the Debtor, Lincoln 95, or the other partners of Lincoln 95.

264.    On or about December 8, 2016, Defendant Reifer converted $300,000 of the
proceeds of the Second Loan to the Debtor, which was deposited in the Debtor's Bank Account,
to his trust, Defendant DRR Trust, for his or its own use or benefit, without the authorization,
knowledge, or consent of the Debtor, Lincoln 95, or the other partners of Lincoln 95.

265.    Based upon the foregoing, the Trustee is entitled to an order and judgment against
Defendant Reifer and Defendant DRR Trust for damages caused to the Debtor in an amount to be
determined at trial, but no less than $1,450,000.00, and directing the Defendant Reifer and
Defendant DRR Trust to return the Transfers or the value thereof, to the Trustee, together with
prejudgment interest and attorneys' fees.

**SIXTH CAUSE OF ACTION**
**Turnover of Property of the Estate – 11 U.S.C. §§ 541 and 542(a)**
**(Against All Defendants)**

266.    Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1
through 265 of this Complaint as if fully set forth at length herein.

267.    The Transfers were made with Debtor funds and property that belonged to the
Debtor.

268.    The First Reifer Distribution and Second Reifer Distribution bypassed Lincoln 95
and were paid directly to Defendant Reifer, as a limited partner of Lincoln 95, in violation of
Paragraph 13 of the Debtor's Operating Agreement.

269.    The DRR Trust Distributions bypassed Lincoln 95 and were paid directly to
Defendant DRR Trust, as a limited partner of Lincoln 95, in violation of Paragraph 13 of the
Debtor's Operating Agreement.

270.    Upon information and belief, Jeremy Reifer, the remaining limited partner of

Lincoln 95, did not receive any transfers from the Debtor or Lincoln 95 at the time Defendant

Reifer and Defendant DRR Trust received their Transfers from the Debtor.

271.    The capital accounts maintained by Lincoln 95 for each of Defendant Reifer and

Defendant DRR Trust were negative at the time of each of the Transfers.

272.    At the time of the Transfers, the Debtor did not have profits to be distributed to

Lincoln 95 or derivatively to its General Partner or Limited Partners.

273.    At the time of the Transfers, the Debtor did not have income to be distributed to

Lincoln 95 or derivatively to its General Partner or Limited Partners.

274.    The Transfers were made to Defendant Reifer and Defendant DRR Trust without

the authority of Lincoln 95's general partner as required by the Partnership Agreement.

275.    The Transfers were in not in payment for services provided to the Debtor.

Accordingly, the Trustee is entitled to a return of the Transfers for the benefit of the Debtor's estate

because they were never earned by Defendant Reifer or Defendant DRR Trust.

276.    The First Reifer Distribution and the Second Reifer Distribution should be

reclassified as loans or advances made by the Debtor to Defendant Reifer.

277.    The DRR Trust Distributions should be reclassified as loans or advances made by

the Debtor to Defendant DRR Trust.

278.    As of the Petition Date, the Debtor's books and records, as set forth in the books

and records of Lincoln 95, reflect an aggregate amount due the Debtor from Defendant Reifer on

account of advances made by the Debtor, by and through Lincoln 95, to Defendant Reifer in the

amount of $700,000.00 (the "Reifer Receivable"), which constitutes property of the estate within

the meaning of Section 541 of the Bankruptcy Code.

279.    As of the Petition Date, the Debtor's books and records, as set forth in the books

and records of Lincoln 95, reflect an aggregate amount due the Debtor from Defendant DRR Trust on account of advances made by the Debtor, by and through Lincoln 95, to Defendant DRR Trust in the amount of $750,000.00 (the "DRR Trust Receivable"), which constitutes property of the estate within the meaning of Section 541 of the Bankruptcy Code.

280.    The unearned amount of the Reifer Receivable and the DRR Trust Receivable is property of the Debtor's bankruptcy estate.

281.    Pursuant to Section 542(a) of the Bankruptcy Code, Defendant Reifer is required to turn over the full amount of the Reifer Receivable to the Debtor's estate.

282.    Pursuant to Section 542(a) of the Bankruptcy Code, Defendant DRR Trust is required to turn over the full amount of the DRR Trust Receivable to the Debtor's estate.

283.    Based upon the foregoing, the Trustee is entitled to an order and judgment against Defendant Reifer and Defendant DRR Trust directing that the Defendants turn over to the Trustee an amount to be determined at trial, but no less than the amount of the Reifer Receivable and the DRR Trust Receivable, together with prejudgment interest and attorneys' fees and any other relief deemed just and appropriate.

### SEVENTH CAUSE OF ACTION
**Constructive Fraudulent Conveyance –
11 U.S.C. §§ 544(a) and (b), 550, and 551 and
N.Y. Debtor and Creditor Law 11 U.S.C. §§11 U.S.C. §§ 273-275
(Against All Defendants)**

284.    Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 283 of this Complaint as if fully set forth at length herein.

285.    Pursuant to Section 544(a) of the Bankruptcy Code, the Trustee has independent standing to assert the fraudulent conveyance claims set forth in this complaint, which are grounded in NY DCL §§ 272 – 275.

286.    Each of the Transfers constituted a transfer of an interest of the Debtor within the meaning of section 101(54) of the Bankruptcy Code.

287.    At all times relevant to this Complaint, there was at least one creditor that held a matured or unmatured unsecured claim against the Debtor that is allowable under section 502 of the Bankruptcy Code or that is not allowable only under section 502(e) of the Bankruptcy Code.

288.    The Transfers were made to the Defendants during the Recovery Period.

289.    The Debtor did not receive fair consideration in exchange for each of the Transfers.

290.    The Debtor was insolvent at the time it made each of the Transfers to the Defendants, or, in the alternative, became insolvent as a result of each of the Transfers.

291.    The Debtor was at all times relevant to the Transfers incapable of repaying the funds borrowed from the Lender.

292.    There are creditors that hold unsecured claims against the Debtor allowable under Section 502 of the Bankruptcy Code that were creditors at the time each of the Transfers was made.

293.    Based on the foregoing, pursuant to sections 272, 273, 273-1, 274, and or 275 of the NY DCL, sections 544(b), 550(a) and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the Transfers made during the Recovery Period; (b) directing that those Transfers be set aside; and (c) recovering the Transfers, or the value thereof, from Defendants for the benefit of the Debtor's estate and its creditors.

<u>EIGHTH CAUSE OF ACTION</u>
**Intentional Fraudulent Conveyance –**
**11 U.S.C. §§ 544(a) and (b), 550 and 551**
**and N.Y. Debtor and Creditor Law § 276, 276-a, 278 and/or 279**
**(Against All Defendants)**

294.    Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 293 of this Complaint as if fully set forth at length herein.

295.    Pursuant to Section 544(a) of the Bankruptcy Code, the Trustee has independent standing to assert the fraudulent conveyance claims set forth in this Complaint, which are grounded in NY DCL §§ 276-279.

296.    At all times relevant to this Complaint, there has been one or more creditors who have held or still hold matured or unmatured unsecured claims against the Debtor that are allowable under Section 502 of the Bankruptcy Code or that are not allowable only under section 502(e) of the Bankruptcy Code.

297.    While acting as the Manager of the Harlem Properties with access to the Debtor's Bank Accounts, Defendant Reifer caused the Debtor to make the Transfers to the Defendant Reifer and Defendant DRR Trust under the premise that they were "distributions".

298.    Upon information and belief, Lincoln 95's General Partner had not authorized any of the Transfers whether or not they were classified as "distributions".

299.    Each of the Transfers was made from the Debtor.

300.    Each of the Transfers constituted a transfer of an interest of the Debtor within the meaning of section 101(54) of the Bankruptcy Code.

301.    Each of the Transfers was to or for the benefit of the Defendants as set forth above.

302.    The Debtor was at all times undercapitalized and incapable of satisfying its debts as they became due or repaying the funds borrowed from lenders to the Debtor.

303.    All of the Transfers were made within the six (6) years of the Petition Date.

304.    The Debtor had creditors that held unsecured claims against the Debtor allowable under Section 502 of the Bankruptcy Code that were creditors, or successors-in-interest to creditors at the time each of the Transfers were made.

305.    Specifically, during the Recovery Period, Defendant Reifer caused the Debtor to

transfer a total of $858,736.00 to Defendant Reifer; $750,000.00 to Defendant DRR Trust; and

$86,231.99 to Defendant RMC Equities.

306.    Defendant Reifer caused the Debtor to make the Transfers with actual intent to

hinder, delay, or defraud its creditors. The Defendants exercised the requisite fraudulent intent in

facilitating Defendant Reifer's efforts, by and through the Debtor, so they would receive the

Transfers to the detriment of the Debtor and its creditors.

307.    Based on the foregoing, pursuant to sections 276, 276-a, 278 and/or 279 of the NY

DCL, Sections 544(b), 550(a) and 551 of the Bankruptcy Code, the Trustee is entitled to judgment:

(a) avoiding and preserving the Transfers made during the Recovery Period; (b) directing that those

Transfers be set aside; (c) recovering those Transfers, or the value thereof, from Defendants for

the benefit of the Debtor's estate and its creditors; and  (d) recovering attorneys' fees from the

Defendants.

**NINTH CAUSE OF ACTION**
**Disallowance of all Claims – 11 U.S.C. § 502(d) and (j))**
**(Against Defendants Reifer and RMC Equities)**

308.    Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1

through 307 of this Complaint.

309.    Defendants have asserted one or more claims, including the Daniel Reifer Claims,

against the Debtor's estate.

310.    Section 502(d) of the Bankruptcy Code provides that the Court shall disallow any

claims, including the Daniel Reifer Claims, by a transferee of a transfer avoidable under section

544 or 548, unless such transferee has paid over the amount or returned the property for which

such entity or claimant is liable.

311.    Section 502(a) of the Bankruptcy Code provides that a claim or interest, proof of

which is filed under section 501 of this title, is deemed allowed, unless a party in interest, [. . .]

47

objects.

312.    Portions of the Daniel Reifer Claims are objectionable and should be disallowed because they are time-barred by the applicable statute of limitations.

313.    Portions of the Daniel Reifer Claims are objectionable and should be disallowed because they were duplicatively asserted against the Debtor.

314.    Portions of the Daniel Reifer Claims are objectionable and should be disallowed because they were for payments that did not directly benefit the Debtor.

315.    For all the foregoing reasons, this Court should disallow any and all claims, including the Daniel Reifer Claims, in their entirety unless and until the Defendants return the Transfers, or the value thereof, to the Trustee.

**WHEREFORE,** the Trustee respectfully requests that a judgment or judgments be entered against the Defendant as follows:

i. Awarding damages for breach of contract in an amount to be determined at trial but not less than $1,694,967.99, plus interest thereon;

ii. In the alternative, awarding an amount for which each Defendant was unjustly enriched to be determined at trial but not less than $1,694,967.99, plus interest thereon and compelling the Defendants to return that amount to the Debtor's estate;

iii. Awarding damages for breaches of fiduciary duties of loyalty and care in an amount to be determined at trial but not less than $1,450,000, plus interest thereon;

iv. Avoiding and directing the return of the Transfers as constructive fraudulent transfers together with interest and reasonable attorneys' fees and costs thereon;

v. Avoiding and directing the return of the Transfers as intentional fraudulent transfers together with interest and reasonable attorneys' fees and costs thereon;

vi. Disallowing any claims held or asserted by any of the Defendants against the Debtor's estate;

vii. Granting Plaintiff such other and further relief as this Court may deem just and proper.

Dated:    New York, New York
          August 5, 2022

                          **KLESTADT WINTERS JURELLER**
                          **SOUTHARD & STEVENS, LLP**


                    By:   */s/ Kathleen Aiello*
                          Kathleen Aiello
                          200 West 41st Street, 17th Floor
                          New York, New York 10036
                          Tel: (212) 972-3000
                          Fax: (212) 972-2245
                          Email: kaiello@klestadt.com


                          *Counsel to Plaintiff Yann Geron, Chapter 7*
                          *Trustee*

# <u>Exhibit A</u>

**EXHIBIT A**
**2014 Transfers to Defendants**
**Geron v. Daniel Reifer, et al. (Adv. Pro. No. 22-_____(MG))**

## Transfers to Defendant Reifer

### Distributions:

| Payee | Check/Transaction Clear Date | Check #/Type of Transaction | Amount | Memo |
|---|---|---|---|---|
| Daniel Reifer | 12/15/2014 | Transfer to xxxx4767 | 600,000.00 | |
| | | | **600,000.00** | |

### Management Fees:

| Payee | Check/Transaction Clear Date | Check #/Type of Transaction | Amount | Memo |
|---|---|---|---|---|
| Daniel Reifer | 11/12/2014 | 2348 | 3,400.00 | Mgmt Jan'14 |
| Daniel Reifer | 12/2/2014 | 2357 | 37,400.00 | Mgmt Feb '14 - Dec '14 |
| | | | **40,800.00** | |

**Defendant Reifer 2014 Total**   **640,800.00**

**EXHIBIT A**
**2015 Transfers to Defendants**
**Geron v. Daniel Reifer, et al. (Adv. Pro. No. 22-_____) (MG)**

**Transfers to Defendant Reifer**

**Distributions:**

| Payee | Check/Transaction Clear Date | Check #/Type of Transaction | Amount | Memo |
|---|---|---|---|---|
| Daniel Reifer | 1/6/2015 | 2372 | $100,000.00 | Distribution |
| | | | **$100,000.00** | |

**Management Fees:**

| | | | | |
|---|---|---|---|---|
| Daniel Reifer | 1/21/2015 | 2381 | $3,900.00 | Mgmt Jan '15 |
| Daniel Reifer | 2/3/2015 | 2386 | $3,900.00 | Mgmt Feb '15 |
| Daniel Reifer | 6/15/2015 | 2416 | $7,800.00 | Mgmt March & April '15 |
| Daniel Reifer | 7/20/2015 | 2417 | $3,900.00 | Mgmt May '15 |
| Daniel Reifer | 8/19/2015 | 00001197 | $7,800.00 | |
| Daniel Reifer | 9/23/2015 | 2433 | $3,900.00 | Mgmt Aug '15 |
| Daniel Reifer | 10/29/2015 | 2441 | $7,800.00 | Mgmt 9/15 - 10/15 |
| | | | **$39,000.00** | |

| Defendant Reifer 2015 Total | **$139,000.00** |
|---|---|

**Transfers to Defendant RMC Equities**

| | | | | |
|---|---|---|---|---|
| RMC Equities | 3/24/2015 | Transfer to xxxx1235 | $6,000.00 | |
| RMC Equities | 9/23/2015 | 00001200 | $4,013.84 | |
| RMC Equities | 10/22/2015 | 00001209 | $4,013.84 | |
| RMC Equities | 11/19/2015 | 00001216 | $4,013.84 | |

| Defendant RMC Equities 2015 Total | **$18,041.52** |
|---|---|

| TOTAL 2015 Transfers to Defendants | **$157,041.52** |
|---|---|

Page 2

**EXHIBIT A**
**2016 Transfers to Defendants**
**Geron v. Daniel Reifer, et al. (Adv. Pro. No. 22-_____(MG)**

**Transfers to Defendant DRR Trust**

| Payee | Check/Transaction Clear Date | Check #/Type of Transaction | Amount | Memo |
|---|---|---|---|---|
| DRR Irrevocable Trust | 11/4/2016 | 2516 | $175,000.00 | Distribution |
| DRR Irrevocable Trust | 11/7/2016 | 2517 | $225,000.00 | Distribution |
| DRR Irrevocable Trust | 12/1/2016 | 2528 | $50,000.00 | Dist |
| DRR Irrevocable Trust | 12/8/2016 | 2523 | $300,000.00 | Dist |
| | | **Defendant DRR Trust 2016 Total** | **$750,000.00** | |

**Transfers to Defendant Reifer**

| Payee | Check/Transaction Clear Date | Check #/Type of Transaction | Amount | Memo |
|---|---|---|---|---|
| Daniel Reifer | 1/20/2016 | 2458 | $7,800.00 | Mgmt Nov Fee '15 |
| Daniel Reifer | 8/24/2016 | 2499 | $9,756.00 | Mgmt 1/16 - 2/16 |
| Daniel Reifer | 10/3/2016 | 2508 | $9,756.00 | Mgmt 3/16 - 4/16 |
| Daniel Reifer | 11/22/2016 | 2526 | $29,268.00 | Mgmt 5/16 - 10/16 |
| Daniel Reifer | 12/21/2016 | 2532 | $9,756.00 | Mgmt 11/16 - 12/16 |
| | | **Defendant Reifer 2016 Total** | **$66,336.00** | |

Page 3

**EXHIBIT A**
**2016 Transfers to Defendants**
**Geron v. Daniel Reifer, et al. (Adv. Pro. No. 22-_____(MG)**

## Transfers to Defendant RMC Equities

| Payee | Check/Transaction Clear Date | Check #/Type of Transaction | Amount | Memo |
|---|---|---|---|---|
| RMC Equities | 1/20/2016 | 1235 | $4,013.84 | |
| RMC Equities | 2/22/2016 | 1245 | $4,013.84 | |
| RMC Equities | 3/16/2016 | 1253 | $4,013.84 | |
| RMC Equities | 7/20/2016 | 2497 | $4,016.55 | balance l if % |
| RMC Equities | 8/23/2016 | 1289 | $4,016.55 | |
| RMC Equities | 9/22/2016 | 1295 | $4,016.55 | |
| RMC Equities | 10/24/2016 | 1305 | $4,016.55 | |
| RMC Equities | 11/9/2016 | Transfer To xxxx281235 | $20,000.00 | |
| RMC Equities | 11/22/2016 | 1315 | $4,016.55 | |
| RMC Equities | 12/21/2016 | 1328 | $4,016.55 | |
| | | **Defendant RMC Equities 2016 Total** | **$56,140.82** | |

| | | | |
|---|---|---|---|
| | **TOTAL 2016 Transfers to Defendants** | **$872,476.82** | |

Page 4

**EXHIBIT A**
**2017 Transfers to Defendants**
**Geron v. Daniel Reifer, *et al*. (Adv. Pro. No. 22-_____(MG))**

| Transfers to Defendant Reifer | | | | |
|---|---|---|---|---|
| **Payee** | **Check/Transaction Clear Date** | **Check #/Type of Transaction** | **Amount** | **Memo** |
| Daniel Reifer | 1/13/2017 | Misc Debit Transfer to 1500844767 | $5,600.00 | |
| Daniel Reifer | 7/26/2017 | 1037 | $1,750.00 | Roth for I. Cbrd 278 4A prnno DR CK #1428 |
| Daniel Reifer | 8/15/2017 | 1045 | $5,250.00 | Mgmt 1/17 |
| | | Defendant Reifer 2017 Total | **$12,600.00** | |

| Transfers to Defendant RMC Equities | | | | |
|---|---|---|---|---|
| RMC Equities | 1/19/2017 | 1339 | $4,016.55 | |
| RMC Equities | 2/23/2017 | 00001012 | $4,016.55 | |
| RMC Equities | 5/18/2017 | 00001026 | $4,016.55 | |
| | | Defendant RMC Equities 2017 Total | **$12,049.65** | |

| | | TOTAL 2017 Transfers to Defendants | ***$24,649.65*** | |

Page 5